All rise. Hear ye, hear ye, hear ye. 3rd District Appellate Court is now in session. The Honorable William E. Oldridge, Justice for Divers. Please be seated. Thank you. Will the clerk please call the first case. Case number three, 090457, for Ender Ryder v. John F. J. Luxinger v. PDH Pressure Cleaning, Inc. and Patricia H. Appellate, February 8, 2011. Mr. Luxinger, you may proceed. Thank you very much, Your Honor. Good morning. Good morning. And good morning to counsel and all the students and faculty. And may it please this Honorable Court, this is a case that arises out of an automobile accident back in November of 1999. And just a brief factual context, as you may recall from reading the briefs, that my client was a passenger in a car, and all she was doing that evening was out with her husband. They were on Route 6 heading east, and they were going to go to dinner, I believe it was, at Harrah's Casino. And as they headed east, and the car that my client was a passenger in, as it went into the eastbound right turn lane, the car was struck violently by a car driven by defendant Ms. Hackey, which had entered the highway across Route 6, crossed three and a half lanes of traffic, two sets of double yellow lines, colliding with my client's car, causing severe injuries. And when the collision occurred, Ms. Hackey's testimony was that she was going 30 to 35 miles an hour. Prior to that, as you may recall, Ms. Hackey had left the roadway numerous car lengths to the east before the intersection of Empress Drive and Route 6, and had driven along the shoulder for 10 to 12 car lengths, entering that shoulder at 40 to 45 miles an hour by her own testimony, and then reentering the highway by her own choice, according to her own testimony, again, still going 40 to 45 miles an hour. Now, this Honorable Court is being asked today, I believe, to answer three basic questions. The first question is that, did the trial court err in permitting the defendant to read into testimony, read into evidence, an inadmissible police report that contained substantive evidence containing conclusions of hearsay witnesses regarding how the accident happened? The second question is, did the lower court, the trial court, err in permitting the defendant to repeatedly insinuate, through opening statement, through the various witnesses, and on closing argument, that the plaintiff's attorney and plaintiff were colluding to commit perjury and commit fraud? And the third question is, was the jury's verdict and the judgment entered against the manifest weight of the evidence where the defendant, Ms. Hackey's story or her explanation for how she could leave the highway on her own accord, drive numerous car lengths westbound, and then reenter the highway by her own choice, cross three and a half lanes of traffic, reentering the highway at 40 to 45 miles an hour? And I'm sure you'll remember that she testified, the defendant did at the trial, that when she reentered the highway, that's when she lost control. And she also testified that, pardon me, that Officer Carr has testified that that's what he told her. So those are the three questions we're asked. I believe you're being asked to answer today. I believe the answer to every one of those questions is yes. However, I respectfully submit that if you find that the answer to any one of those questions is yes, you must reverse the lower courts, the trial courts, judgment in this case. Now, I'll start with the inadmissible police report containing the hearsay statements. As you may recall, the defendant attempted during the cross-examination of my client to bring in the police report via what she said was refreshing recollection. And as you may recall, we cite the Hall case, Hall v. Baum. We also cite Peoples v. Jenkins. Now, in this case, what happened is, and I bring to your attention that, and this was in the transcript on page 1-2 through 1-816, where it is stated that she begins to ask the question, she being counsel for the defendant, begins to ask Ms. Riley the question, do you recall reading the police report where it indicates that the witnesses have attributed, and I'm going to go to witnesses and drivers, people who are not my client and who aren't in trial, who did not show up at trial and testify. And as she begins to ask that question, the attorney for plaintiff, Mr. Annis, objects first time, and he approaches his honor at the lower court and says, this is improper. You shouldn't do it. And the court says at the bottom of page 18-12, I'm going to let her proceed and see where we're going with this. Then, again, the question is, do you recall reading from the police report that attributed a statement, and then he objects again for the second time on 18-13, and they have a colloquy, and Mr. Annis, the plaintiff's attorney, says, Your Honor, if defendant's attorney, if she, if defendant's attorney is going to read that part that refers to the drivers, because as you may recall, the statement in the police report said the witnesses and the drivers said that the defendant was forced off the road by a car that came out of Emerson Drive. So when Mr. Annis objects and says, if she's going to read this part about the drivers, and the court says, if she's going to, how do you know that? And Mr. Annis says, well, once it's out, Your Honor, it's out. It shouldn't come out. Then there's a colloquy, there's an inaudible portion, and the defendant's attorney says, I know, I know, I previously said I wouldn't, but I'm doing it now. And then Mr. Annis says, she can't read the part that talks about what the drivers said. That's hearsay. That's double hearsay. And it's improper. That's the third objection. The court says, I overruled, and then Mr. Annis again says, I'm 1815, but to let her read it into the record is improper. We will see. Go ahead, overruled. She attempts to ask the question again. He objects for the fifth time, overruled. Then she reads in the hearsay. The hearsay being, according to witnesses and both drivers, a vehicle pulled out of northbound Empress Drive onto Route 6, causing number one, Ms. Hackey's car, to go onto the north shoulder to avoid the collision. Do you recall reading that part of the police report? Your Honor, the case law is clear. The Hall versus Bond case is right on point. The same basic fact pattern. It is improper. And if I may say, the court in Hall states, and this is on 16 of our brief, the court in Hall says, while police reports, quote, may be used for the limited purpose of impeachment as to inconsistent statements or to refresh a witness's recollection, which is purportedly what was going on here, they cannot be used as the defendant did to divulge substantive evidence to the jury, unquote. The court went further and says, quote, the court found that the reading of the police report improperly served, quote, as a substitute for competent evidence and it, quote, seriously prejudiced the plaintiff's case. During the trial, counsel, was any of that substantive evidence introduced? Well, actually, yes and no. And here's why I say it this way. The only person who was a witness that is attributed, you know, one of the witnesses that was called was, and her name escapes me, it was a certain individual whose name is Ebony Woman. She had been in an automobile with her husband. He was one of the drivers. She testified and her testimony at court was much different than the statement attributed to her in this report. For instance, she did say that she saw an automobile, I believe a silver automobile, coming north on Empress Drive and she said it was going at a high rate of speed, I think on cross she said that was 20 miles an hour, and approaching the intersection. She then testified she did not see it enter the intersection. She did not know if it turned right or left. She did not see it go near the defendant's car. She does not know if it went into the defendant's lane. She did not see defendant's car leave the roadway. And she did see defendant's car for one or two seconds later on the shoulder because of all the dust that was picked up. So did she say she saw a car? Yes. All these other things about these conclusions about forcing this automobile off the roadway, that was not there. And no other witness, neither driver was called. There were other witnesses that were on the police report that were not called. So this came in. So you're saying that that evidence is at variance with what seems to be a consolidated summary by the officer at the scene saying that this sequence of events the witnesses said occurred on the report, and now you're saying in trial the testimony there's a variance by that one witness. Absolutely, Ron. Absolutely. I think the witness's name was Darlene Dawson. Thank you very much, Ron. You're absolutely right. But the double hearsay that you're objecting to is the fact that witnesses and both drivers told the officer a vehicle pulled out of Empress Drive. Right. And then Darlene Dawson did testify that a vehicle pulled out of Empress Drive. That's why I said the answer was yes or no. Okay. So where's the prejudice? Where's the harm? Well, the prejudice is that Ms. Dawson saw the car pull out. There was the conclusion in the hearsay attributed to more than just Ms. Dawson. The conclusion was that the car pulled out and forced Ms. Hackey's car off the road. That was the conclusory statement that's contained and attributed to more than Ms. Dawson, both drivers and other witnesses. So because that became the central narrative of Ms. Hackey's defense that I was forced off the road by this mystery car or this car that one other person saw. I was forced off the road and then we have this entire sequence of events, which I'll address, which I believe were basically impossible to occur physically or inherently probable. But that's the prejudice, Your Honor. Again, it wasn't just Ms. Dawson. As the defendant argued in closing argument and stated right in her brief, she said, and I'm on page 10 of the defendant's brief, Eppley's brief, pardon me. The police report reflected that plaintiff, both drivers and witnesses had told investigating officer facts that were completely consistent with Ms. Hackey's version of what happened. That's the prejudice. It's exactly that they took, Eppley took this hearsay and then wove it in such a way to comport with what Ms. Hackey said and then was able to argue all the witnesses who didn't testify agreed that she was forced off the road. Ms. Hackey didn't testify at trial that she saw her forced off the road. She didn't testify anywhere close to that. No other witnesses testified to that. So that is the prejudice that we see there. Let me ask you, it seems during opening statements didn't plaintiff's counsel refer to a letter that the plaintiff wrote to the police because she disagreed with something in the police report? Yes, Your Honor. And what was that that she disagreed with in the police report? What happened was that, and just one little bit of background, my client was a passenger. She's injured. She's taken to the hospital. I believe the police officer testified. He didn't come and talk to her, but she's injured. I can't recall if she was under sedation or anything at that point. But later on, some weeks later on, she being my client, received a copy of this police report. And when she saw the police report, she didn't remember seeing a silver car on Empress Drive. Now, she didn't contest anything else. She just said, I don't remember seeing that. And she wrote a letter saying, I don't remember seeing that. That's the long and short of it. In substance, I mean, she wasn't saying anything about anything else. And that became the narrative regarding fraud and at least part of the narrative regarding purported fraud and perjury on the part of plaintiff's attorney and my client. Because what the defendant argued was, you see what happened. And this shows up in opening, and it shows up during the examinations, and it shows up on close. See, what happened is that Ms. Riley told the police on the night of the accident what she saw, this hearsay conclusory stuff, statement. Was it the officer that testified as to what she told him? I believe the officer did. And I believe he did say that Ms. Riley did say this. And that wasn't hearsay, was it? No, I will grant, Your Honor, that to impeach my client, but by the way, it was brought in for refreshment and recollection, not for impeachment. But I'll agree that can you use a police report for my client's statement? Absolutely. But that's not how they used it. When the officer testified that your client said, hey, that's not hearsay. I would agree, Your Honor. I would agree, absolutely. Well, I would say that the record is replete with instances of the defense counsel arguing or suggesting and inferring that my client and the attorney colluded to cook up a story and wrote the letter because she brought litigation and that she changed her testimony and story because she was foreseeing litigation. And then, as you may recall, there were further allegations that she actually made up irrelevant medical complaints, which were not ever claimed to be part of this case, which were not ever claimed to be causally related. The judge allowed in inferences that somehow or other that was done purposely to try to cook up additional complaints and damages. And in the last part of our briefing, Your Honor, since I'm so short of time, you'll recall that the story of the defendant, Ms. Hackey, is just doesn't bear, it's so improbable that it doesn't make sense. And I would, on that issue, we've cited Calvetti, the Mayfield case, Second National Bank and Napolitano for the premise that as a matter of law, a finder of fact may not consider evidence that is physically impossible or so highly or inherently improbable as to be contrary to the experience of humankind. Just for one point. When she states, for instance, the defendant does, that she chose to leave the highway because of this car that's over there that's going much slower than her, she's racing at 40 to 45 miles an hour west. And she says she leaves the highway having her brake on the entire time. And she goes 10 to 12 car lengths and then admits that nothing about the shoulder caused her, made her get back on. She chose to get back on the highway. She gets back on going 40 to 45 miles an hour. It hasn't slowed down one iota. Then she admits in the police officer states, as she told them, that she lost control when she gets on the highway. She goes across three and a half lanes of traffic and smashes into my client's car at 30 to 35 miles an hour by her own admission. I submit under Mayfield, under Napolitano, under a second national bank case, all of those cases have much weaker facts. In fact, under Mayfield you will recall a police. Your time is up if you'd like to just finish. This last statement? Yes. Briefly. Yes. In the Mayfield case, as you'll recall, a police officer who was on official business who entered an intersection and got involved in an accident, the court found and the court stated you can't enter an intersection without being able to control your car at any speed. And that was a police officer. And this is precisely what we have in this case. Thank you very much for the time. Appreciate it. Thank you, counsel. Ms. Vanderland, you may respond. Good morning, your honors, counsel, students and faculty. I'm going to first address the alleged errors that were made by the lower court. And the first thing that I'm going to say in that regard is that all of the claims that the appellant is making as to errors in the lower court came about because the appellant introduced that information into the lower court with the exception of the right-sided complaints issues. So when we get to the whole police report issue, the question that you have to ask is how did the police report even become at issue? Well, it became at issue because during plaintiff's direct testimony and questioning by her own counsel, they asked her, did you ever see this car come out of the Empress Casino? Nope, never saw it. Okay, well, after it all happened, were you ever interviewed by the police officer? Yes, I was. Did you tell the police officer you saw it? No, no. Well, did you ever see the report after the fact? Yes, I did. It came in. I saw the report. I read the report. I reviewed the report. Oh, well, when you saw that report, did anything strike you, what have you? Did you respond to it? Yeah. I saw in the report that the police officer was saying that I saw a silver car come out of the Empress Casino. She was listed as a witness on the report, and then the report had its summary page. What did she do? She wrote a letter to the police officer. And counsel just indicated in that letter to the police officer, she told the officer she didn't recall ever seeing the car come out of the Empress Casino. That's not what she said in that letter. In that letter, she said there was a miscommunication between her and the police officer, that there's no way she could have seen a car come out of the Empress Casino based on her location and things of that nature. So they say, well, okay, they go through it. Then they say, well, why did you write that letter? Why did you write it? Well, I didn't want anybody to think that I was a witness to something that I wasn't a witness to. I didn't see it. I didn't want anybody to think that I actually witnessed it. That's how it all went down. So then on cross-examination, I'm asking her... Wasn't there a motion in Lemonade No. 29 where the court actually ruled in favor of plaintiffs saying that this communication, this letter, and communication with the attorney prior to writing that letter was not fair game, could not be included in that motion, No. 29. Don't open the door. Absolutely. And we're dealing with the second error, but they're all interrelated. Because that's exactly what happened. They opened the door. They asked her, now, why did you write that letter? Why did you do it? So she gave her explanation. So then when I get up in cross-examination, she gets to tell the jury that she saw certain information in a police report that caused her to write this letter, but she omits other information in the police report that she would have had to read, because it's all interwoven together. But she omits the information where it's being attributed to her that she saw this car cause my client to swerve off the road to avoid an accident. She omits that. So I'm trying to question her about that during my cross-examination. She acknowledges she got the report, she read it, etc. Then I go to say, well, do you recall any other information in the police report that would have prompted you to write that letter concerning, you know, the car being forced off the road? No, I don't recall that being in the police report. So what do I do? I do what I'm supposed to do. I take the police report, I ask the court's permission to show it to her to refresh her recollection. This is all impeachment. It all goes to, she's introduced all of this evidence. Not me, she did. The judge says, yeah, try to refresh her recollection. I give her the report, and what does she say? I don't recall ever reading that. I don't even recall ever seeing this report. Now, the judge is like, what? So I'm trying to then, I'm going, trying to read the report. There's objections. The judge then handles all of the objections. And the judge is like, well, let me see the letter. So I show the letter to the judge, which they had already gone through, had been introduced in evidence. And the judge is like, well, this letter deals with exactly what's in the police report, other than the omissions that I'm trying to get in front of the jury. And he's like, read the police report. Read the police report because she already introduced it, and now she's playing games that she never saw it when I'm trying to refresh her recollection. Ironically, after I read the statement that the judge told me I could read, now she admits that she saw the police report, and she saw that statement in the police report. This police report would have never had to been read if plaintiff wasn't playing games. She was playing games, and it was within the sound discretion of the trial court to not allow her to play those games. It got read because she introduced the content to begin with. I had the right to impeach her on what she was claiming to be the reason why she wrote it and what she was relying upon as the basis for why she wrote it. Which was the very crux in theory of our case, that our client was forced off the road. So then we get into the whole attorney issue. And you are right, judge, there was a motion in Lemonade, you can't bring up the fact that she had an attorney at the time that she wrote this letter to the police department saying she never said what she said. We never introduced that information until after they asked her for an explanation. Well, why did you write this letter? And then she provides her explanation, which I have already told you. So during break, after lunch, I go to the judge and say, judge, before I start my cross examination, there's an issue I feel we need to address. He knew right away. He knew right away, and plaintiff's counsel's first words out of his mouth was, this doesn't open the door, judge. Hmm. That's the first words out of his mouth. Well, it absolutely opened the door, because the plaintiff now gets to give an explanation as to why she wrote that letter, but we don't get to cross examine her on it. They knew that we were blocked out on the motion in Lemonade. So they give an explanation thinking we can't go out for the rebound now. That's not the way it works. You don't get to have your cake and eat it too, but that's what they wanted to do. And Judge Garrison said, no, it's coming in. You open the door. There was no prejudice there. If there was prejudice, they caused their own prejudice, but I don't think there was prejudice in any of that. All's we established from that point is, when you wrote this letter, you had already hired an attorney. There's sufficient case law that says your actions in litigation are absolutely relevant to your motive, your bias, your intentions, all of those things. We established she had already hired a lawyer before she wrote that letter. Our explanation was, she was pursuing litigation. Certainly. Did she want there to be a statement attributable to her in a police report where she was saying our client had to go off the road? The very defense that we're making in the case? No, she didn't. And certainly that was our argument. So there was no prejudice. There was no error to begin with. But if there was error, it certainly wasn't prejudicial because the plaintiff made her bed. As to the... Will the record show in closing the plaintiff's counsel dealing with this issue? The record did show because what the judge allowed the plaintiff to do during redirect is to give an explanation why she hired an attorney. And that redirect, she explained she hired an attorney because she had gotten a call to give a statement, she was scared, so she wanted to hire an attorney. And then during closing, the whole issue was these people called her and that's why she had to get an attorney and all of this. It had nothing to do with her wanting to change her testimony. And if she hadn't written a letter to correct what was wrong, we would be pointing out now that she never corrected what was wrong when she could have corrected what was wrong earlier. So that was all, that all was dealt with during plaintiff's closing argument. The jury was allowed to hear their explanation and the arguments that plaintiff's counsel made. As far as the manifest weight of the evidence, sorry, I forgot my watch. As far as the manifest weight of the evidence or the new trial issue, plaintiff did not bring one witness to trial to dispute what Ms. Hackey had to say. Not one witness. Plaintiff herself denied she saw anything happen before the impact, so she couldn't testify as to it. So Ms. Hackey gave an account of what happened. To say that Ms. Hackey never said she was forced off the road, she absolutely said she was. She said that the lights of the car coming out of the Empress were within inches of her when she turned her head. So there's a law, there's a statute that says you have to take action to avoid an accident. But even if there wasn't, what human being in their right mind would just let a car plow into them? On their driver's side. That is just human nature to try to avoid that accident. And that's what she did. And she had a split second time to make that decision and only minimal seconds to handle everything that happened afterward. Gravel on the side of the road, a ditch. She's trying to control her car, but she's not successful in that regard. Does she have her brake on? She does have her brake on. Is she slamming on her brake? No. And none of us would say she had to. Not a reasonable person would say she had to. She tried to control her car. It's her testimony she had the brake on, is that correct? And nobody to dispute it. Nobody to dispute it. He says, well, her car didn't slow down. Well, that doesn't mean she didn't have her brake on on a gravelly road. Again, you don't have to slam your brake. Well, counsel has cited some case law that you can't base a verdict on highly improbable that out of the realm of ordinary knowledge, if one has a brake on, wouldn't one's speed be reduced? It may be reduced, depending on how hard you have your brake on, but there is conflicting testimony in that regard. Okay? I would disagree that all of the testimony is as plaintiff. There's bits and pieces, but there's conflicting testimony as to how fast she was going. At the time she impacted, she was going 30 to 35 miles an hour, so how could she not have her brake on? In addition, she says that the reason why she left the shoulder was because she hit a bump in the shoulder that propelled her onto the road. Not that she automatically steered her car back onto the road. She was trying to regain control and she couldn't. But here's the deal. With the jury's instructed that she had to act as a reasonably prudent person would act under similar circumstances. And that's what the jury had to deal with. Not in all of the testimony of mistake. Conflicting testimony in some regards, perhaps. But they were the judges of the credibility. They heard all of the testimony and they made the determination that she was not negligent because she was not liable. In addition, they could have made the decision based on the sole proximate cause instruction that they were given, which there's no objection here that that sole proximate cause instruction was given. And they could have made the decision that it was the car coming out of the Empress, which was the sole proximate cause of the plaintiff's injuries. As opposed to anything that Ms. Haig did or didn't do, which was completely a reaction to a very dangerous situation. So we don't know why they made the decision they did, but they could have made it on either one of those elements. Not just, you know, breach of duty or what have you, but on proximate cause as well. So what the plaintiff is asking you to do is to substitute, to sit in the seat of the jury and to substitute your decisions on credibility and the weighing of the evidence and things of that nature. And I would submit that that's not what this court is for. Only, only, if taken all the evidence most favorable to my client, only then if it's clearly against the manifest, the decision is against the manifest weight, should this decision be overturned. And I submit they submitted no evidence. Contrary to what my client had to say about what happened. And we had, in addition, we had Darlene Dawson who testified as to what she saw happen. We had the police officer testify as to what Ms. Riley said happened. And that's not impeachment, that's evidence. A prior inconsistent statement by a party is evidence. And in that police, or the police officer said she said, Ms. Riley said, she saw a car come out of the Empress, cause the defendant to swerve off of the roadway. And after that, Ms. Riley didn't see, you know, it says she never saw anything else happen after that. Opposing counsel is concerned that Dawson's testimony really is conflicting with what had been a consolidated witness statement by the police, police report. I would disagree with that. I would disagree with her testimony. First off, I believe she testified that she told the police that a car came out of the Empress, it was silver and it caused the defendant to leave the roadway. She testified that that's what she told the police officer. At trial, she testified that she saw the car come out, that it was silver. She didn't actually see it make contact or where it went in the roadway, but then seeing a So when she talked to the police officer, she put it all together and gave that statement to him. At trial, she's, you know, obviously it's broken down, you know, in much more detail than when the police officer has taken the statement, but it's not inaccurate. And Ms. Hickey was also a witness and a driver on that police report. And she testified that that's exactly what happened. And Ms. Riley was listed as a witness on that police report. And she testified. But that doesn't really matter in the big scheme of things, Your Honor, with no disrespect to your question, of course, because they're the one that introduced the content of the police report. And Ms. Riley is the one who claims she didn't remember it anymore. That would have never came in. Would have never came in had they not introduced it to begin with and had Ms. Riley not played games and claimed she didn't remember the very police report that she just testified to, she received the threat. It would have never came in. So with that, I'll conclude my remarks and go ahead. There's been some strong accusations that maybe are more apparent in the briefs than in arguments here today that you were accusing counsel perhaps of suborning perjury or his client of engaging in false testimony. Did you use the word, those words fraud or perjury in a closing argument? Never. Not once. I made the connection that she hired an attorney before she wrote the letter. And we had a timeline that established a treatment timeline that established that 18 months would go by and she wouldn't treat. And then all of a sudden, 12 days before her deposition, she'd go to the doctor. Five days before her doctor's deposition, she would go to the doctor. Her doctor would give testimony that would say certain injuries aren't related that she had claimed before and she would come back and now those injuries she doesn't have anymore, now they're back to the original injury. We gave a timeline, but we never said that they were colluding or they were suborning perjury. What was the purpose of summarizing those points? The purpose is the credibility of her damage complaints. She's claiming that she had, you know, disabling complaints, that they were long-term, that they had occurred for, gosh, at that point, I think, eight years and they were going to continue into the future, that she would need future surgery, things of that nature. And our point is, is that really credible when you have 18 months of non-treatment? So that was the point. So if I can just wrap up in conclusion, it would be our position that the decision of the trial court and the jury should stand. Thank you for your time and hope you all have a very nice weekend. And thanks for the opportunity to hear your arguments. Mr. Lexinger, you may reply. Thank you very much, Your Honor. Much to reply to. I understand the time constraints, so I'll try to make it as brief as I can. Your Honor, there's no case, one thing, counsel did right now, which is her job, what she attempted to do and succeeded to do at trial, and that was to make the case about a letter. What the case was about was a car that leaves the highway, drives 10 or 12 car lengths, never slows down one bit, then reenters the highway by her own choice and crosses three and a half lanes of traffic. Well, who first brought the letter to issue at trial? Well, we did talk about it at opening statement. We had to, Your Honor. We had to front it. We knew exactly in the arguments on motions and liminate what the theory of the case was of defendant. And by the way, as we all know, all of us who are practitioners, no one walks out and does their opening statement on the fly. They have it all prepared. And just as we knew, after opening statement, counsel came out on her opening statement and began to attack the credibility of our client because of the letter and all these things. But you had the court's ruling on motion eliminate number 29. So tell me why you had to preemptively strike on that letter issue. Well, we believed that the, just to discuss the fact that a letter was written because it was a fact and it was going to come up at some point in time, was where we needed to go. But if I hasten to add, Your Honors, there's no case that says if someone writes a letter contesting what they believe they said, that now you get to read in an inadmissible hearsay regarding a bunch of other witnesses. No case says that. In fact, what I'd like to do is quote the Jenkins case. Oh, by the way, before I quote the Jenkins case, in terms of counsel, the questions that counsel used the word fraud or used this type of insinuation, here's part of her closing argument. And Ms. Riley wrote the letter and tried to change the statement she gave the police. I submit that her motivation was because she was filing this lawsuit. And she knew that if she was filing this lawsuit, the reason she retained a lawyer was for purposes of this litigation, and you have to consider that in motivation as why she would have changed her statement. What's wrong with that argument? Well, the argument is to attempt to, in the context of everything else, attempt to insinuate through innuendo that my client was telling a false story in collusion with her attorney. We believe that that is improper and has no place in the courtroom. Now, having said that, I would go to or just discuss a simple fact. Counsel has argued that there was that the reason that this accident occurred is because Ms. Hackey was forced off the road west of, pardon me, east of the intersection. Now, I just want to point out a couple things, as we've pointed out. Ms. Hackey herself testified that she told the police officer she lost control of her car when she reentered the highway at 40 to 45 miles an hour, long after she had been on the shoulder. And as we all know, there's a statute that we cite that says you can only use the shoulder to stop or to accelerate from a stop. She testified that she lost control when she reentered. The police officer so testified that she told him that. And here is, again, a defendant's brief, page 10. The police report reflected that plaintiff, both drivers, pardon me, I got the wrong one, I'm sorry. Page 45. Officer Cars testified that his investigation supported defendant's testimony that when she attempted to reenter the roadway, she lost control of her vehicle and crossed over the eastbound traffic. So, Your Honors, not only is this a judicial admission, everything that happened before there is irrelevant anyway. May I just point to a couple of the exhibits? Your Honors, I'm pointing to 59. I don't know, can you see? As you see, this shoulder is perfectly straight. It's flat. The officer testified and everyone agreed that this photo as well as the others show the condition as it existed at the time of the accident. Counsel just argued there was a ditch. There's no ditch. Absolutely, Your Honor. And when we asked Ms. Hankey to come out and point out the ditch, she couldn't do it. It's hard to see. There was no ditch. So she travels 10 to 12 car lengths, does not slow down one mile per hour. In fact, she said I was going 40 to 45 miles an hour plus. When she re-entered, that required her to re-enter, she never left the shoulder, she never approached any obstruction, and she never slowed down one bit, and then she agrees, I lost control when I re-entered, and then she crossed three and a half lanes of traffic. So whatever happened in the back, 12 lanes back, even if it did occur, is completely irrelevant. She admitted she lost control, re-entered the highway on her own choice at high speed, violating the statute, and then I would argue again under Mayfield, to re-enter the highway under any speed, if you can't control your vehicle, is contrary to Illinois law and negligence as a matter of law. So I would argue to Your Honor that based on that, her story just, it's impossible and inherently improbable that these things occur. One other point. Counsel, your time is up. Thank you, counsel, both for your fine arguments this morning in this matter. It will be taken under advisement in a written disposition shall issue.